WARREN BRIGGS AND WIFE, GLORIA BRIGGS v. JOHN ROSENTHAL AND THE SUN PUBLISHING CO., INC.

No. 8415SC497

(Filed 2 April 1985)

1. Torts § 1; Trespass § 2— intentional infliction of mental distress—extreme and outrageous article—questions for court and jury

In an action for intentional infliction of mental distress arising out of a publication, whether the article may reasonably be regarded as extreme and outrageous is initially a question of law for the court. If the court determines that it may reasonably be so regarded, it is for the jury to decide whether, under the facts of a particular case, defendant's conduct in publishing the article was in fact extreme and outrageous.

2. Torts § 1; Trespass § 2— magazine article—no intentional infliction of mental distress

A magazine article about plaintiffs' deceased son in which the son was described as being a heavy drinker but also honest, full of life, tender, happy, free and optimistic was not so extreme or outrageous that it would support an action to recover damages for the intentional infliction of mental distress.

APPEAL by plaintiffs from *Fountain, Judge*. Order entered 25 October 1983 in Superior Court, ORANGE County. Heard in the Court of Appeals 10 January 1985.

Plaintiffs' complaint, which is premised on the theory of intentional infliction of mental distress, in summary alleges that their only son, Warren Briggs, Jr., died in an automobile accident on 30 June 1982. In October 1982 defendant Rosenthal wrote an article about Warren which was published by defendant Sun Publishing Company in a magazine-periodical called *The Sun*. The article described several unpleasant characteristics of Warren in an unpleasant and insulting manner calculated to cause outrage. It was published in a reckless and irresponsible manner, and defendants knew or should have known that the article would cause great pain and suffering to plaintiffs. The plaintiffs have suffered and will continue to suffer severe anguish and emotional distress from reading the article, and from its public distribution.

The article, which was incorporated by reference into the complaint, was entitled "Saying Goodbye to Warren." In the article defendant Rosenthal described his friend Warren as being a

heavy drinker, but also honest, full of life, tender, happy, free and optimistic:

> No categories really work for Warren. Because I can't place him I am driven to write this piece which might enable me to touch on his complexity. He went against all the rules, certainly all the rules of character and appreciation. Who was he? I don't know. Ask fifty people in town and you will get answers which couldn't describe the same person. For instance, strangers usually disliked him when he was drinking, which was a lot of the time, because he wasn't serene: he rolled around town with a raucous energy, his eyes on fire for some kind of hooray, his tongue constantly testing out accents from weird countries. His life would pour out of his stunning sea-green eyes and out of his red, red face, and trying to save everything which had piled up inside all at once, he would sputter, hold his head in his hands, and whirl around in circles.

> . . . .

> He didn't do very well with responsibility. But this is what I mean by the categories not working. If he needed liquor then other people need something else: the nipple of security, money in the bank, status, respect (what can you do with it? he might ask), the illusion of power, another frying pan or wok. We say society works with these compensations, but not with booze. Screw society. It's not working no matter what we say. The rich are still in charge and the slaves settle for less. Warren was a pain in the ass but he was evidence that we exist. You couldn't pretend that he wasn't there the way we pretend most things aren't there.

> . . . .

> But when you figured that out, what did you do with Warren? Dismiss him? Feel sorry for him? Call him a drunk and avoid him? This is what he taught you if you were brave enough for the lesson: that unrehabilitated and to some extent hopeless, he was as good as anybody you knew; I mean, he was even great. The fact is, those who condemned him, those who held their liquor, those who woke up in their own bed all the time, were simply not his match. In the ways that

count I am certain that he was immensely substantial person, as fine, as dignified (ah, the digno!), as important as any solid citizen I ever met, and certainly more than those who put him down.

You see, he never went for votes, telling you anything he didn't know, or made any kind of deal that would cleverly trick you out of something. He was as incapable of manipulation as a flower. What you saw, you got. If he didn't like you or his feelings were hurt, he would sit quietly, without smiling; he wouldn't talk about you from a corner of the room. Never. He despised gossip and psychology as being the same thing. Perhaps he had been too easily used by soft-core doctors who sat in front of him with their little ordered lives and wrote negative reports about his past and possibilities. He knew he was fodder for a particular type of person, but he didn't mind because, truly, they weren't really there for him: in his mind, a desk person with only words hasn't yet come fully alive, and tied as he was, miserably and handsomely, to his own life, he wasn't about to get angry at their mere income-earning words. He knew he could always run from them and he was very fast, very fast.

. . . .

Yet I don't want to take anything away from my friend as I try to understand him, now that his death makes that an obligation. He was confused, but so are we. He traded in a lot of possibilities for good times but almost everyone else trades in the good times for possibilities which to Warren were unimaginable. And the things he kept were wonderful— his spirit, his insistence that boredom was the enemy, his refusal to be false or dishonest. He was a fool indeed but he was God's fool, here to show us the limits of pomposity and the chill in our households. The wonder of Warren—as well as his tragedy—was that he never settled for a stunted version of life, and especially not the most recent reduction which has us dominated by the chicken-shit myths of pop psychology, obsessed with our health and money markets, in awe of our own self-absorption, all the glory of our language reduced to the babble of computerized discourse, all life down to a plea.

. . . .

And I remember that once, while we were walking down Franklin Street, Warren suddenly dived on the hood of a parked car. It was unexplainable of course. He was filled with something, joy and frustration perhaps, and the only way to express his feelings at that moment was to dive on the car. I recall how he looked flying through the air, and how at the last moment he spun around so he ended up bouncing on the hood in a sitting position and there he lolled for awhile, as puzzled and delighted by himself as I was.

He was the only friend I had who would dive on the hood of a car. What does that mean? Look around you and you will see it meant a lot.

In their answer defendants moved for a dismissal pursuant to G.S. 1A-1, Rule 12(b)(6). From the trial judge's order granting the motion to dismiss, plaintiffs appeal.

*Alexander and Associates by Sydenham B. Alexander, Jr., and H. William Miller, Jr., for plaintiff appellants.*

*Smith, Patterson, Follin, Curtis, James and Harkavy by Donnell Van Noppen III, and Northern and Little by J. Anderson Little for defendant appellees.*

PARKER, Judge.

The sole issue before us is whether the trial judge erred in dismissing plaintiffs' complaint pursuant to G.S. 1A-1, Rule 12(b)(6). A complaint should not be dismissed for failure to state a claim, unless it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161 (1970). A complaint must be dismissed when on its face it appears that no law supports it, that some essential fact is missing, or that some disclosed fact defeats it. *Mumford v. Hutton & Bourbonnais Co.,* 47 N.C. App. 440, 267 S.E. 2d 511 (1980). The question before us is whether plaintiffs' complaint is sufficient on its face to withstand defendants' motion. We hold that it is not.

Here the only conduct alleged was publication of the article attached as Exhibit A and incorporated by reference into the complaint.

While North Carolina has recognized the tort of intentional infliction of mental distress, our research does not disclose a reported decision in this jurisdiction arising out of publication of an article. In *Dickens v. Puryear*, 302 N.C. 437, 276 S.E. 2d 325 (1981), defendant brutally assaulted plaintiff and threatened death if plaintiff did not move out-of-state; in *Stanback v. Stanback*, 297 N.C. 181, 254 S.E. 2d 611 (1979), defendant breached his agreement to pay taxes in a marital dispute property settlement; in *Woodruff v. Miller*, 64 N.C. App. 364, 307 S.E. 2d 176 (1983), defendant, in an overt hate campaign, posted wanted signs publicizing an old teenage criminal charge against plaintiff, a prominent citizen in the community; and in *Morrow v. Kings Dept. Store*, 57 N.C. App. 13, 290 S.E. 2d 732, *review denied*, 306 N.C. 385, 294 S.E. 2d 210 (1982), this court upheld dismissal of plaintiff's action for intentional infliction of mental distress arising out of defendant's detention of plaintiff for shoplifting.

The elements of the tort are: (i) extreme and outrageous conduct, (ii) which is intended to cause and does cause (iii) severe emotional distress to another. *Dickens v. Puryear, supra*.

[1]  In ruling on defendants' Rule 12(b)(6) motion, the initial question is whether the determination of extreme and outrageous conduct is a question of fact for the jury or a question of law for the court. We hold that in an action for intentional infliction of mental distress arising out of a publication, whether the article may reasonably be regarded as extreme and outrageous is initially a question of law for the court. If the court determines that it may reasonably be so regarded, then it is for the jury to decide whether under the facts of a particular case, defendants' conduct in publishing the article was in fact extreme and outrageous. *See, e.g., Casamasina v. Worcester Telegram & Gazette, Inc.*, 2 Mass. App. Ct. 801, 307 N.E. 2d 865 (1974) where defendant newspaper published an article concerning the death of plaintiff's daughter which included a statement by the medical examiner that she had a long history of involvement with drugs; the court held defendant's conduct was neither extreme nor outrageous, and affirmed the trial court's sustaining of defendant's demurrer. *See also Fry v. Ionia Sentinel-Standard*, 101 Mich. App. 725, 300 N.W. 2d 687 (1980). *See generally* Restatement (Second) of Torts (hereinafter "Restatement") § 46, Comment h.

As to what is sufficiently outrageous to give rise to liability, the comments in the Restatement are instructive.

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
>
> . . . .
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion . . . .

Restatement § 46, Comment d.

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, or outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that an actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

Restatement § 46, Comment f.

[2] We find, after reading "Saying Goodbye to Warren," that the article may not be reasonably regarded as extreme or outrageous. Although perhaps not flattering, the article was honest, sincere and sensitive. Although we recognize that to plaintiffs, grieving parents bereft of their son, the article was offensive, we find that the article does not reach the level of extreme and outrageous conduct necessary to sustain a cause of action.

---

**Briggs v. Rosenthal**

---

Moreover, in the instant case, unlike previous cases decided by our appellate courts, defendants' action, publication of the article, was not specifically directed toward plaintiffs. The tort of intentional infliction of mental distress imports an act which is done with the intention of causing emotional distress or with the reckless indifference to the likelihood that emotional distress may result. Restatement § 46, Comment i. As this is an intentional tort the actor must act with reckless disregard or the intent to cause severe emotional distress to the victim.

Defendants' article was published in a periodical magazine intended for the public. Plaintiffs were not the subject of the article. Their claim is that of third party family members distressed because they feel their deceased son is disparaged in defendants' article. Prosser and Keeton, in the Law of Torts, § 12 (5th ed. 1984), observe that recovery to third parties "is clearly limited to the most extreme cases of violent attack, where there is some especial likelihood of fright or shock." In the instant case there was no physical act committed against plaintiffs' son, nor was the article directed to the parents.

After careful analysis of decisions of our Supreme Court relating to the tort of intentional infliction of mental distress, and guided by the Restatement, we do not believe application of the tort of intentional infliction of mental distress should be extended, under the facts alleged in plaintiffs' complaint, to allow recovery by a third party in the context of the published article presented here. The trial court's dismissal of the complaint pursuant to G.S. 1A-1, Rule 12(b)(6) is

Affirmed.

Chief Judge HEDRICK and Judge WHICHARD concur.