Leonard T. WHITLOCK, Sandra Whitlock, David K. Whitlock, Plaintiffs,

v.

DUKE UNIVERSITY and Peter B. Bennett, Ph.D., Defendants.

No. C–84–149–D.

United States District Court, M.D. North Carolina, Durham Division.

June 16, 1986.

Donald H. Beskind, of Beskind & Rudolf, Durham, N.C. and Richard Stanley Scott, of Malley, Rosenfeld & Scott, Beverly Hills, Cal., for plaintiffs.

Robert M. Clay, Theodore B. Smythe and Patricia L. Holland, of Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, Raleigh, N.C., for defendants; Max Wallace, Office of University Counsel, Duke University, Durham, N.C., of counsel.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, Chief Judge.

This matter comes before the Court on Motion for Summary Judgment (January 3,

1986) by defendants Duke University and Dr. Peter B. Bennett and Motion for Partial Summary Judgment In Favor of Plaintiffs (January 6, 1986) by plaintiffs Leonard T. Whitlock, Sandra H. Whitlock, and David K. Whitlock. The present diversity action arises from events associated with Leonard Whitlock's participation as an experimental subject, in a simulated deep dive experiment called Atlantis III, conducted at Duke University. The Court will grant defendants' motion for summary judgment and deny plaintiffs' motion for partial summary judgment.

### FACTS

The Atlantis Series of dives were conducted by the F.G. Hall Laboratory of Duke University and consisted of four experimental simulated deep dives. The purpose of the Atlantis dives was to research high pressure nervous syndrome. Mr. Whitlock participated as a diver in Atlantis I and Atlantis III. Mr. Whitlock, at the time of the Atlantis experiments, was an experienced diver and had worked in the field for some time.[1] Mr. Whitlock graduated from the Florida Institute of Technology with a degree in oceanographic technology. Subsequently, he worked as a diving medical technician from about 1975 until 1977 with the Harbor Branch Foundation, a working oceanographic research organization. At Harbor Branch Mr. Whitlock worked with advanced diving systems, submersibles, and air/mixed-gas diving. He then took a diving medicine course and

received additional training in diving at the Commercial Diving Center in California. Later he worked as a diver medic for Oceaneering International, a company involved in the construction and maintenance of oil rigs. Prior to becoming involved in the Atlantis series of dives at Duke University, Mr. Whitlock had made approximately 1,500 non-tethered scuba dives using air, 200 to 300 tethered air dives, 200 oxygen surface decompression dives, 50 mixed gas dives, and 6 helium-oxygen saturation dives to between 450 and 680 feet.

Prior to the Atlantis I dive, Mr. Whitlock heard of the Atlantis series and was interested in participating to further his career. He contacted Dr. Peter B. Bennett, a Ph.D. in Physiology and Biochemistry and the director of F.G. Hall Laboratory, about an opportunity to be a diver.[2] Thereafter, Mr. Whitlock did participate in Atlantis I and suffered no ill effects after the dive. He did not participate in Atlantis II but regarding Atlantis III again Mr. Whitlock contacted Duke and was accepted as a participant.

Prior to the Atlantis III dive Mr. Whitlock went through extensive predive testing and workup. Plaintiffs allege that prior to the Atlantis III dive Mr. Whitlock asked Steve Porter about divers who had participated in prior Atlantis dives. According to Mr. Whitlock, Steve Porter told him that problems experienced by prior divers resulted from environmental stress and personal problems.[3] Mr. Whitlock signed a consent form regarding the Atlantis III

1. Plaintiffs state in their brief in opposition to defendants' motion for summary judgment that the statement of Mr. Whitlock's education and qualifications in defendants' brief in support of summary judgment is accurate. (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 5 [hereinafter Plaintiffs' Brief]).

2. The dives were simulations of ocean depths, but did not involve water. A hyper-baric chamber was pressurized with a mixture of gases.

3. The record, although unclear, indicates that Steve Porter was a diver associated with the Atlantis dives. Mr. Whitlock indicated that he

had been told that Shelton and Bell had some depression and psychological problems. (Mr. Whitlock dep. at 100–02). Dr. Bennett stated that he was aware that Shelton had depression after Atlantis II which he attributed to the evaluation of his position, as it was decided he shouldn't make further dives, and personal problems, including finances. (Dr. Bennett dep. at 50). Regarding Mr. Bell, Dr. Bennett stated he was not aware of depression postdive or immediately postdive and that he didn't think he was aware of it until about March, 1984. (*Id.* at 52–54).

dive. The informed consent form advised that the risks associated with compression were of possible lung collapse, production of fluid, hearing loss, inflammation of the ear, and sinusitis. Regarding the risks associated with decompression the form advised of the risk of decompression sickness including death, disability, and joint pain. The form stated that many, but not all cases of decompression sickness can be cured by prompt recompression. Risks associated with equipment failure were disclosed. Further, the form advised that the research was experimental, that there may be unknown risks, and that injury may not necessarily be avoided even if all precautions are taken. The form advised that compensation would not be provided for injury unless it resulted from negligence.

The Atlantis III dive in which Mr. Whitlock participated as a diver went to a simulated depth of 2250 feet as planned—setting a new world record. After the dive Mr. Whitlock began to experience certain problems which he attributed to his involvement in Atlantis III. Mr. Whitlock alleges that he suffered permanent organic brain damage therefrom. He returned to Duke for postdive testing and followup. Plaintiffs filed the instant action alleging injuries resulting from Mr. Whitlock's participation in Atlantis III.

## DISCUSSION

Plaintiffs' complaint consists of nine counts. The counts respectively allege that defendants are liable for fraud, conspiracy to commit fraud, breach of fiduciary duty, intentional infliction of emotional distress, negligent failure to warn of the alleged danger of organic brain damage, loss of consortium, breach of 45 C.F.R. § 46 (federal regulations concerning human experimentation), strict liability for ultrahazardous activity, and strict liability for human experimentation. The Court will consider counts one and five together and the other counts in turn.

Summary judgment is proper when it appears " 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " 10 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2716 (1983) [hereinafter *Federal Practice and Procedure*] (quoting Rule 56(c)); *Smith v. University of North Carolina*, 632 F.2d 316, 338 (4th Cir.1980). The movant for summary judgment has the burden of showing the grounds for summary judgment. *See* 10A *Federal Practice and Procedure* § 2726. However,

> when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). "Summary judgment has been granted to defendants in suits involving fraud, conspiracy, and other claims turning on state of mind when plaintiff's allegations were not sufficiently supported to establish the existence of a genuine issue of material fact." 10A *Federal Practice and Procedure* § 2730.

## COUNTS 1 AND 5

Count one alleges that Dr. Bennett fraudulently misrepresented the dangers associated with the Atlantis III dive in two ways. In the first aspect of Count One, plaintiffs contend that Dr. Bennett intentionally failed to inform Mr. Whitlock of the alleged danger of permanent organic brain damage by not including such danger on the informed consent form which he signed. Second, plaintiffs contend that Steve Porter's statements regarding the condition of other divers in the Atlantis series were inaccurate and were a result of the fraud of Dr. Bennett. A third aspect of count one alleges that Dr. Bennett fraudulently concealed Mr. Whitlock's true medical condition after the Atlantis III dive by allegedly leading him to believe that his problems were related to environmental and psychological factors when allegedly in fact

he suffered from permanent organic brain damage. Count five alleges that Dr. Bennett negligently failed to warn Mr. Whitlock of the alleged danger of organic brain damage.[4]

## A. FRAUDULENT AND NEGLIGENT FAILURE TO WARN OF ORGANIC BRAIN DAMAGE

The first aspect of count one and count five will be considered initially as they respectively allege the fraudulent and negligent failure to warn of organic brain damage; and therefore, implicate the principles of informed consent. It has been stated that for informed consent to be valid it must be competent, voluntary, informed, and understanding. G. Annas, L. Glantz, B. Katz, *Informed Consent to Human Experimentation* (1977) [hereinafter *Informed Consent to Human Experimentation*] (citing the Nuremberg Code). This case involves the law of informed consent as it applies to nontherapeutic human experimentation. Experimentation involving human research subjects has at least two subcategories: therapeutic and nontherapeutic. Therapeutic experimentation using a human subject may be defined as that experimentation which has as a goal providing a direct benefit (effective medical therapy) to the subject-patient. In contrast, nontherapeutic experimentation is not directed toward providing a benefit to the subject but is concerned with the discovery of data through the research on the human subject. In fact many subjects in

the nontherapeutic context are medically normal individuals. No North Carolina case or statute which directly controls the law of informed consent in the nontherapeutic context has been found. However, North Carolina has a substantial body of law relating to informed consent in the nonexperimental therapeutic context.

"Medical treatment performed without a patient's consent, such as an unauthorized operation, may constitute a battery." Byrd, *The North Carolina Medical Malpractice Statute*, 62 N.C.L.Rev. 711 (1984) [hereinafter Byrd, *N.C. Medical Malpractice Statute*] (citing *Lewis v. Shaver*, 236 N.C. 510, 73 S.E.2d 320 (1952)). The North Carolina Court of Appeals stated in *Nelson v. Patrick* that if a medical procedure is completely unauthorized, it constitutes an assault and battery. 58 N.C.App. 546, 293 S.E.2d 829 (1982). If the procedure is authorized but the patient was not adequately informed of the risks involved, the claim is for negligence. *Id.* However, if the failure to provide adequate information is the result of fraudulent misrepresentation, the action may sound in battery. Byrd, *N.C. Medical Malpractice Statute* at 763. *See also Hunt v. Bradshaw*, 242 N.C. 517, 524, 88 S.E.2d 762, 767 (1955) (Bobbitt, J., concurring); *Bingham v. Hicks*, 44 N.C.App. 152, 260 S.E.2d 435 (1979).

North Carolina General Statute section 90–21.13 sets out the statutory standard of care applicable to informed consent cases related to health care treatment (*i.e.,* therapy).[5] The North Carolina Court of Appeals held that § 90–21.13 applies to

---

**4.** Plaintiffs allege Dr. Bennett's negligence was willful and wanton. Plaintiffs do not claim that defendants were negligent in any way other than with respect to the consent issue. (Plaintiffs' Brief at 6).

**5.** N.C.Gen.Stat. section 90–21.13 states in pertinent part:

(a) No recovery shall be allowed against any health care provider upon the grounds that the health care treatment was rendered without the informed consent of the patient ... where:

(1) The action of the health care provider in obtaining the consent of the patient or

other person authorized to give consent for the patient was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities; and

(2) A reasonable person, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other health care pro-

*therapeutic* experimental procedures conducted in the course of medical treatment. *Estrada v. Jaques*, 70 N.C.App. 627, 321 S.E.2d 240 (1984). Since North Carolina applies the doctrine of informed consent in therapeutic circumstances where the health care provider has as an objective to benefit the patient, the Court believes *a fortiori* that North Carolina would require informed consent by an experimental subject in the nontherapeutic context where the researcher does not have as an objective to benefit the subject. Persuasive authority exists for this seemingly self-evident proposition.[6]

Having established that informed consent is required in the nontherapeutic context, the Court turns to plaintiff's contention that Dr. Bennett fraudulently failed to inform Mr. Whitlock of the alleged danger of organic brain damage. Under North Carolina law,

> To make out a case of actionable fraud, plaintiffs must show: (a) that defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that defendant knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that defendant made the false representation with the intention that it should be relied upon by plaintiffs; (e) that plaintiffs reasonably relied upon the representation and acted upon it; and (f) that plaintiffs suffered injury.

*Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 253, 266 S.E.2d 610, 615 (1980). Fraud can be based on the concealment of a material fact. *Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E.2d 494, 501 (1974). If on motion for summary judgment, the movant negates even one essential element of fraud the motion must be granted. *Russo v. Mountain High, Inc.*, 38 N.C.App. 159, 247 S.E.2d 654 (1978).

■ Mr. Whitlock, a highly experienced and sophisticated diver, admitted in his deposition that he was aware that the Atlantis III dive posed to him the risk of organic brain damage. In response to the question of whether he knew of the risk of permanent brain damage from the Atlantis III dive, Mr. Whitlock stated: "Yes, if not properly treated." (Mr. Whitlock dep. at 169). In fact, plaintiff Whitlock admitted he knew the possibility of organic brain damage existed whenever compression and decompression were involved if not properly treated. (*Id.*). Thus, Mr. Whitlock cannot base a claim of fraud on any alleged concealment of the risk of brain damage resulting from improper treatment. Since Mr. Whitlock knew of such danger, any reliance upon its concealment would be patently unreasonable. Additionally, the informed consent form stated: "many, but not all, cases of decompression sickness can be cured by prompt recompression." (Bennett dep. exhibit # 1, p. 1). Therefore, the informed consent form coupled with Mr. Whitlock's admitted knowledge disclosed to Mr. Whitlock that there existed a danger of organic brain damage associated with decompression even if proper treatment were rendered. Thus, any reliance on the alleged concealment of such danger was unreasonable, and no claim of fraud can be successfully based on such alleged concealment.

■ Giving plaintiffs the benefit of any beneficial inferences from the record, Mr.

---

viders engaged in the same field of practice in the same or similar communities; or

  (3) A reasonable person, under all the surrounding circumstances, would have undergone such treatment or procedure had he been advised by the health care provider in accordance with the provisions of subdivisions (1) and (2) of this subsection.

  (b) A consent which is evidenced in writing and which meets the foregoing standards, and which is signed by the patient or other authorized person, shall be presumed to be a valid consent. This presumption, however, may be subject to rebuttal only upon proof that such consent was obtained by fraud, deception or misrepresentation of a material fact.

6. See discussion of Nuremberg Code. *Infra* at 1470–71.

Whitlock's admission can be viewed as not admitting that he knew of a risk of permanent organic brain damage unique to the Atlantis III dive. However, upon the record it is apparent that defendants have carried their initial motion burden by showing that Dr. Bennett did not knowingly conceal any danger of organic brain damage unique to Atlantis III in order to induce Mr. Whitlock's participation in Atlantis III. It is also apparent that plaintiffs have failed to respond sufficiently to create a genuine issue of fact.

First, it should be noted that Mr. Whitlock initiated his participation in both Atlantis I and III. After hearing of the Atlantis project from a source unassociated with Duke, Mr. Whitlock pursued participation in the project to enhance his diving career. Additionally, Mr. Whitlock read and signed an informed consent form. The form advised him of the risk of death or disability from decompression and of the experimental nature of the dive giving rise to unknown risks. The form also advised that injury will not necessarily be avoided even though all precautions are taken.

With respect to Dr. Bennett's knowledge of risks related to Atlantis III, he indicated in deposition that approximately 240 oxyhelium deep dives had been done before Atlantis III and that at the time he was not aware of any problems associated with the dives involving the mental or physical health of the divers. (Dr. Bennett's dep. at 41). He stated that he had been associated with deep diving research since the 1960s and there was no evidence of such problems. (*Id.*). Dr. Bennett stated that the possibility of organic brain damage was not included on the informed consent form because it was not a normal condition for experimental deep diving. (*Id.* at 37). Dr. Bennett indicated that if Mr. Whitlock had in fact sustained the type of damage alleged it would be the first case ever. (*Id.* at 66). Dr. Bennett further indicated that all risks pertaining to deep diving that had occurred in the past were included on the informed consent form. (*Id.* at 111). Once a movant has come forward with a sufficient showing to carry its burden on a motion for summary judgment on an issue, the respondent cannot sit on his pleadings but must come forward with evidence to show a genuine issue of material fact exists. Fed.R.Civ.P. 56(e).

Plaintiffs have presented no direct evidence that Dr. Bennett knew of a risk of organic brain damage unique to Atlantis III. The Court is aware that fraud is often not provable by direct evidence; therefore, it has carefully scrutinized the record for any circumstantial evidence sufficient to create an issue as to whether Dr. Bennett knew of such risk. The only relevant evidence in the record is Mr. Whitlock's assertion that studies prior to Atlantis III revealed the dangers of decompression sickness and portrayed the symptoms to be the same as those alleged by Mr. Whitlock. (Mr. Whitlock's dep. at 166). Plaintiffs have not submitted the alleged studies in whole or part to the Court nor have plaintiffs argued that these studies relate to the risk of permanent organic brain damage unique to Atlantis III. Plaintiffs also stated in brief that they intended to submit the deposition of an expert, Dr. Ginzburg, relevant to plaintiffs' injuries and to whether Dr. Bennett knew of the danger of permanent organic brain damage. No such deposition was ever submitted. Plaintiffs also attempt to rely on their own answers to interrogatories purporting to state what their experts would say. However, plaintiffs never submitted materials from their experts nor may they rely on their own secondhand recital of what their experts would say. Therefore, the record is devoid of sufficient circumstantial evidence to create a genuine issue as to Dr. Bennett's alleged fraudulent concealment and defendants' motion must be granted on this issue.

The Court now turns to the issue of whether Dr. Bennett negligently failed to inform Mr. Whitlock of the risk of organic brain damage. As in the claim for fraudu-

lent concealment, plaintiffs' claim for negligence must succeed, if at all, on the theory that Dr. Bennett should have warned him of the danger of organic brain damage unique to Atlantis III. This follows because the general danger of organic brain damage associated with decompression was known to Mr. Whitlock as he admitted; and the informed consent form made it clear to Mr. Whitlock that the dangers associated with decompression could not always be avoided by treatment. The form, after advising of the possibility of death or disability associated with decompression, indicated that not all decompression sickness could be cured and that it was not represented that injury would necessarily be avoided even after precautions were taken. (Bennett dep. exhibit #1, p. 1, 5).

■ The first issue in the negligence analysis is to determine the duty owed by a researcher to a subject in the nontherapeutic experimental context. Thus, the issue arises of whether § 90–21.13 controls the standard by which informed consent is judged in the nontherapeutic context. The statute by its own terms is directed to actions against "health care providers" and to claims that "health care treatment" was rendered without "informed consent." N.C.Gen.Stat. § 90–21.13(a). Therefore, the limitation on the statute by its plain language excludes its direct control over informed consent analysis in the context of *non* "health care treatment" human experimentation (*i.e.*, nontherapeutic experimentation). Additionally, the policy considerations and balance of interests are different in the nontherapeutic context than in the therapeutic context,[7] leading the Court to the conclusion that the North Carolina Supreme Court would not apply § 90–21.13 by analogy in the nontherapeutic context to determine the standards for informed consent.

Although the Court does not believe the North Carolina Supreme Court would apply § 90–21.13 per se to the nontherapeutic experimentation context, the Court is not left without persuasive guidance on an appropriate standard of care in such context. The United States Military Tribunal at Nuremberg adopted the Nuremberg Code as a proper statement of the law of informed consent in connection with the trials of German Scientists for human experimentation after World War II. Note, *Experimentation on Human Beings*, 20 Stan.L. Rev. 99 (1967). The Nuremberg Code states in pertinent part:

1. The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent: should be so situated as to be able to exercise free power of choice without the intervention of any element of force, fraud, deceit, duress, over reaching, or other ulterior form of constraint or coercion and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment.

The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.

.     .     .     .     .

7. Proper preparations should be made and adequate facilities provided to

---

7. Note, *Experimentation on Human Beings*, 20 Stan.L.Rev. 99, 104–05 (1967) (In therapeutic context doctor is guided by maxim "first of all,

do no harm" to his patient while nontherapeutic researcher may be more concerned with advancing knowledge).

protect the experimental subject against even remote possibilities of injury, disability, or death.

8. The experiment should be conducted only by scientifically qualified persons.

Nuremberg Code, *reprinted in Informed Consent to Human Experimentation* app. I at 279. Two important differences to note between the Nuremberg Code and § 90–21.13 are that the subjective consent of the subject is always required under the Nuremberg Code whereas under § 90–21.13 a health care provider may escape liability if a reasonable person would have consented if the proper disclosure of information had been made; and more importantly for the purposes of this case the Nuremberg Code requires the researcher to make known to the subject *all* hazards reasonably to be expected and the possible effects upon the health and person of the subject whereas § 90–21.13 only requires the health care provider to apprise the patient of the "usual and most frequent risks and hazards" of the procedure.

Additional support for the Nuremberg Code standard of care is provided by the Declaration of Helsinki which states in pertinent part:

> In the field of clinical research a fundamental distinction must be recognized between clinical research in which the aim is essentially therapeutic for a patient, and the clinical research, the essential object of which is purely scientific and without therapeutic value to the person subjected to the research.

· · · · ·

### III. Non-Therapeutic Clinical Research

1. In the purely scientific application of clinical research carried out on a human being, it is the duty of the doctor to remain the protector of the life and health of that person on whom clinical research is being carried out.

2. The nature, the purpose and the risk of clinical research must be explained to the subject by the doctor.

3a. Clinical research on a human being cannot be undertaken without his free consent after he has been informed;

· · · ·

Declaration of Helsinki, *reprinted in Informed Consent to Human Experimentation* app. II at 281. In its regulations regarding human experimentation, the Department of Health and Human Services requires informed consent. 45 C.F.R. § 46.116(a)(2) (1985) states that a basic element of informed consent is "[a] description of *any* reasonably foreseeable risks ... to the subject." [8] (emphasis added).

■ The Court concludes that North Carolina would analyze informed consent in the nontherapeutic context consistent with 45 C.F.R. § 46.116(a)(2) (1985).[9] *See also Informed Consent to Human Experimentation* at 6–9, *cited in Estrada v. Jaques,* 70 N.C.App. 627, 321 S.E.2d 240 (1984). Thus, while informed consent in such context would have similarities with informed consent in the nonexperimental therapeutic context controlled by § 90–21.13, the Court concludes the degree of required disclosure of risks is higher in the nontherapeutic context than required under § 90–20.13.

The Court now turns to the application of the above analysis to Count five's allegation that Dr. Bennett negligently failed to disclose the risk of organic brain damage to Mr. Whitlock. Under the facts of the instant case, the issue is whether Dr. Ben-

---

8. 45 C.F.R. § 46.116 and its precursors 45 C.F.R. § 46.103(c) (1980) and § 46.109 (1980) adopt a substantially similar approach to risk disclosure.

9. 45 C.F.R. § 46.116(a)(2) is similar to the Nuremberg Code. The word "risk" in § 46.116(a)(2) apparently combines the notions of hazards and effects upon the subject, which are treated separately by the Nuremberg Code. Additionally, § 46.116(a)(2) applies a "reasonably foreseeable" standard to both hazards and effects under the concept of risk; while the Nuremberg Code speaks separately of "effects" which may "possibly" come from participation in experiments.

nett had a duty to inform Mr. Whitlock of a risk of organic brain damage unique to Atlantis III. Under the higher level of risk disclosure applicable to nontherapeutic experimentation, Dr. Bennett had the duty to inform Mr. Whitlock of all risks that were reasonably foreseeable. Thus, the issue becomes whether a risk of brain damage different from that normally associated with decompression and unique to experimental deep diving was a reasonably foreseeable risk of Atlantis III.

■ As in the previous discussion of fraud, Dr. Bennett at deposition indicated that no injury of the type alleged by Mr. Whitlock had ever been seen as a result of deep diving experiments. (Dr. Bennett dep. at 67). Dr. Bennett also stated that the informed consent form did not advise of the possibility of organic brain damage because it was not a normal condition for experimental deep diving. (*Id.* at 37). Additionally, Dr. Bennett stated that approximately 240 oxyhelium dives had been done before Atlantis III. (*Id.* at 40). Dr. Bennett stated he had been present at a majority of the deep dives prior to Atlantis III; he was in regular contact with the people doing experimental deep diving through scientific meetings, and he stayed current in the literature relevant to tri-mix and heli-ox deep diving. (*Id.* at 42). According to Dr. Bennett, there was no evidence of any problems with the health, mental or physical, of the divers resulting from the dives prior to Atlantis III. (*Id.* at 41). Therefore, the evidence in the case relevant to the foreseeability of a risk of permanent organic brain damage unique to experimental deep diving establishes that it was not a risk to be reasonably expected, and that Dr. Bennett exercised diligence in staying abreast of developments in deep diving research. Although plaintiffs' argued in brief what their experts would say, no deposition, affidavit, or other evidence by their experts was even submitted by plaintiff to contradict Dr. Bennett's assertions. Plain-

tiffs may not rely on their own interrogatories as a substitute for materials from their experts and may not simply rest on their pleadings. Therefore, no genuine issue of fact exists as to whether the risk of organic brain damage unique to experimental deep diving was a reasonably foreseeable risk, and summary judgment must be granted to defendants on the negligence issue.[10]

### B. STATEMENTS BY STEVE PORTER

In the second aspect of count one, plaintiffs allege that Dr. Bennett defrauded Mr. Whitlock by the statements of Steve Porter relating to divers in the Atlantis Series prior to Atlantis III. Mr. Whitlock stated in deposition that prior to the Atlantis III dive he asked Steve Porter about the condition of Billy Bell and Bud Shelton, persons who had dived in prior Atlantis dives. (Mr. Whitlock dep. at 103–04). According to Mr. Whitlock, Steve Porter responded stating that Bell and Shelton had been checked out and that Dr. Bennett had indicated to him that their problems were related to environmental stress and personal problems. Mr. Whitlock admits that Dr. Bennett never personally made any representations about the conditions of prior Atlantis divers to him. (*Id.*. at 162–63). Plaintiffs do not allege that Steve Porter himself was trying to defraud Mr. Whitlock, thus no issue of fraud attributable to Dr. Bennett by agency principles arises. In effect plaintiffs claim Dr. Bennett knew that Bell and Shelton suffered organic brain damage and deliberately failed to correct Steve Porter's statements to the contrary.

■ Dr. Bennett indicated at deposition that in his knowledge if Mr. Whitlock suffered organic brain damage it would be the

---

10. The Court is not confronted with the question of whether the consent form in the instant case was adequate absent Mr. Whitlock's admit-  ted knowledge of the risk of organic brain damage.

first time anybody had received such damage as a result of an experimental deep dive. (Dr. Bennett dep. at 64–66). At deposition Mr. Whitlock was questioned about his allegation that Dr. Bennett gave Steve Porter false information concerning the prior divers. The following exchange occurred at deposition:

Q: Do you have any reason, any factual basis, to believe that if Dr. Bennett did make such a statement, that he was not telling the truth about what his actual belief was?

A. I do not know.

(Mr. Whitlock dep. at 164). Plaintiff has put on no evidence that Shelton or Bell suffered permanent organic brain damage, that Dr. Bennett knew of such damage, if any, or that Dr. Bennett even knew of Steve Porter's statement to Mr. Whitlock. In fact, Mr. Whitlock's own testimony indicates that Steve Porter's conversation with him did not result from any deliberate attempt by Dr. Bennett to communicate to him but resulted completely from Mr. Whitlock's questioning Steve Porter on the subject. Therefore, because the uncontradicted evidence is that Dr. Bennett did not know of any organic brain damage to Shelton or Bell, an essential element of plaintiffs' fraud claim is negated. Dr. Bennett could not have intentionally failed to correct Steve Porter's statements if he did not know they were incorrect. Hence, no genuine issue of fact is presented on plaintiffs' claim of fraud regarding statements by Steve Porter, and summary judgment must be granted on this issue.

## C. ALLEGED FRAUDULENT CONCEALMENT OF POSTDIVE INJURIES

The third and final aspect of count one alleges that Dr. Bennett fraudulently concealed from Mr. Whitlock that he suffered from organic brain damage as a result of the Atlantis III dive. Dr. Bennett testified that Mr. Whitlock's medical health was not under his direct control but was under the control of Dr. Miller who was the medical director (Dr. Bennett dep. at 30); Dr. Miller and clinical personnel looked after Mr. Whitlock's situation. (*Id.* at 34). Dr. Bennett testified that prior to Atlantis I Mr. Whitlock scored about 40% lower on a verbal memory test than other subjects and that he tended to be lower than average on a vigilance test. (*Id.* at 27–28). After the dive many tests were done on Mr. Whitlock to try and solve the problem. (*Id.* at 30). Duke then referred Mr. Whitlock for evaluation to Bowman Gray Medical School. (*Id.* at 32). Dr. Bennett testified that at the time of the independent report there was no evidence of physical damages to Mr. Whitlock. (Bennett dep. at 64). Dr. Bennett indicated at deposition that after Mr. Whitlock. (*Id.* at 64). Dr. Bennett indicated at deposition that after Mr. Whitlock's June evaluation his test scores were still within normal limits but a little lower than predive and immediate postdive scores which had been assessed as normal. (*Id.* at 61). Dr. Bennett stated that after Mr. Whitlock was at Duke for reevaluation the information that he was given was that the tests were apparently normal. (*Id.* at 87). Additionally, Dr. Bennett indicated that in either June of 1981 or January of 1982 he made a note that Mr. Whitlock's retest scores in June showed some mild change in verbal memory which he had not seen before. (*Id.* at 100).

█ In the face of Dr. Bennett's denial that he had evidence of physical damage, plaintiffs must come forward with at least some material to withstand the motion for summary judgment. No direct evidence of fraudulent concealment of postdive injuries has been adduced. Therefore, the question is whether sufficient circumstantial evidence, viewing the record in the light most favorable to plaintiffs, exists to permit an inference of fraud. Although plaintiffs alluded to expert testimony relevant to what Dr. Bennett knew about Mr. Whitlock's postdive condition and represented in brief (Plaintiffs' Brief in Opposition at 14) that their opinions would be revealed by deposi-

tion, no such material was submitted to the Court. The Court believes that the record before it does not give rise to a genuine issue of fact that Dr. Bennett fraudulently concealed the alleged true nature of Mr. Whitlock's postdive injuries. Therefore, summary judgment must be granted defendants.

## COUNT TWO

In count two plaintiffs allege that Dr. Bennett conspired with his associates to defraud Mr. Whitlock by, prior to Atlantis III, concealing the risk of permanent brain damage. As discussed under count one, the record is insufficient to create a genuine issue of fact that Dr. Bennett knew of a danger of organic brain damage unique to Atlantis III. Thus, by necessity the record is insufficient to create a genuine issue of fact that he conspired with others to conceal the same. It should also be noted that plaintiffs adduced no sufficient evidence of any conversations, communications, or *circumstantial* evidence permitting an inference of an agreement to conceal the alleged risk.

Count two also alleges that Dr. Bennett conspired with his associates to conceal the true nature of Mr. Whitlock's injuries after the Atlantis III dive. Even if it is assumed that Mr. Whitlock has organic brain damage,[11] the record, as discussed under count one, is insufficient to create a genuine issue of fact that Dr. Bennett knew of such condition. Therefore, no genuine issue of fact exists regarding Dr. Bennett's involvement in a conspiracy to conceal the same.

## COUNT THREE

In count three plaintiffs allege that a fiduciary relationship existed between defendants and Mr. Whitlock. Further, plaintiffs allege that defendants breached their fiduciary duties by the actions alleged in counts one and two. The Court has already found that no genuine issue of fact exists regarding the actions alleged in counts one and two; therefore, count three incorporating such acts as a breach of fiduciary duty is similarly without sufficient support to create a genuine issue of fact.

## COUNT FOUR

In count four plaintiffs allege that actions of defendants as complained of in the earlier counts constituted intentional infliction of emotional distress. North Carolina recognizes the tort of intentional infliction of emotional distress. *Stanback v. Stanback,* 197 N.C. 181, 254 S.E.2d 611 (1979); *Briggs v. Rosenthal,* 73 N.C.App. 672, 327 S.E.2d 308 (1985). However, since the Court has found that no genuine issue of material fact exists as to plaintiffs' allegations in prior counts of tortious conduct by defendants, the fifth count which is dependent on said allegations is similarly defective.

## COUNT SIX

In count six Mr. Whitlock's wife and son, Sandra Whitlock and David Whitlock, allege claims for loss of consortium. Plaintiffs allege that the negligent and intentional acts of the defendants as earlier alleged in the complaint resulted in the loss of consortium to Sandra and David Whitlock. A claim for loss of consortium alleges that as a result of a defendant's causing personal injuries to someone, secondary injuries were also caused to another person because of their relationship to the one originally injured. Therefore, such a claim is dependent upon the defendant being responsible for the personal injury to the initially injured person. In the instant case the Court has found that no genuine issue of fact exists regarding whether the defendants' alleged intentional and negligent acts caused Mr. Whitlock's alleged injuries. Therefore, the claims for loss of consortium by necessity fail.

## COUNT SEVEN

In count seven plaintiffs allege that defendants failed to adequately disclose the

---

**11.** Plaintiffs have not put competent evidence in    the record on this point.

risks associated with Atlantis III and thereby breached the risk disclosure requirements of 45 C.F.R. § 46.116. The Court notes that 45 C.F.R. § 46.116 was not in effect at the time of Atlantis III; but that its precursors 45 C.F.R. § 46.103(c) and § 46.109 were in effect and that with respect to risk disclosure requirements they are substantially similar. § 46.109 required at the time of Atlantis III that investigators funded by the Department of Health and Human Services obtain the informed consent of human subjects. § 46.-103(c) required as a basic element of informed consent that the potential subject be given, "a description of any attendant ... risks reasonably to be expected."

■ Count seven alleges that the acts previously alleged in prior counts additionally constituted a breach of the Code of Federal Regulations. Because the standard of risk disclosure under 45 C.F.R. § 46.103(c) is almost identical to that under 45 C.F.R. § 46.116, which the Court believes would guide the North Carolina Supreme Court, the analysis under count seven is the same as under counts one and five, and thus the result reached is the same and summary judgment must be granted defendants. The Court does not reach the issue of whether a private cause of action in favor of an experimental subject arises from 45 C.F.R. § 46.109 and § 46.103(c) because the above analysis is dispositive of any such potential claim.

## COUNTS 8 AND 9

In counts eight and nine plaintiffs seek recovery based on strict liability. Count eight asserts that the Atlantis III dive constituted an ultrahazardous activity and count nine asserts that strict liability attaches because the activity involved human experimentation.

■ North Carolina recognizes ultrahazardous activities as a basis for applying strict liability. *Guilford Realty & Insurance Co. v. Blythe Bros Co.*, 260 N.C. 69, 131 S.E.2d 900 (1963); *Paris v. Carolina Portable Aggregates, Inc.*, 271 N.C. 471, 157 S.E.2d 131 (1967); *Falls Sales Co. v. Board of Transportation*, 292 N.C. 437, 233 S.E.2d 569 (1977); *Trull v. Carolina-Virginia Well Co.*, 264 N.C. 687, 142 S.E.2d 622 (1965). However, in none of the cases cited by the plaintiffs does the benefit of strict liability run to a person participating in the activity deemed to be ultrahazardous. Indeed, plaintiffs cite *Restatement of Torts* § 520 (1938) as reflecting North Carolina's law of ultrahazardous activity; § 520 states an ultrahazardous activity is one which: "a). Necessarily involves the risk of serious harm to the person, land, or chattels of *others* ..." (emphasis added). Again, the benefit of strict liability under § 520 runs to "others;" not to those engaged in the activity. *See also Gaston v. Hunter*, 121 Ariz. 33, 48, 588 P.2d 326, 341 (1978). In *Trull*, 264 N.C. 687, 142 S.E.2d 622 (1965) the plaintiffs sought to impose liability upon the defendant for vibration injury associated with well drilling. Plaintiffs had contracted with the defendant and brought defendant on their land to drill the well. The *Trull* court held plaintiffs could not recover because they were not innocent parties within the rule of strict liability. *Id.* at 693, 142 S.E.2d at 625. The court stated, "[h]ere the activity was not upon adjoining or neighboring property ... nor were the plaintiffs unconcerned with the activity itself." In the instant case Mr. Whitlock was a participant in the very activity alleged to be ultrahazardous. Therefore, the Court is persuaded that North Carolina's law of ultrahazardous activity is inapplicable to the case at bar.

The Court is cognizant that a legitimate policy debate surrounds the issue of strict liability as applied to subjects in human experimentation. It is a question of policy whether the individual subject, after full and complete disclosure of the risks and

informed consent,[12] bears the risk of injuries not resulting from the fault of the investigators or whether the investigators and society at large bear such risks. The Court believes the appropriate forum for such debate is the North Carolina General Assembly and believes the North Carolina Supreme Court would so hold. The North Carolina Supreme Court has refused to extend strict liability to products and has indicated its deference to the legislature in the area of strict liability. *See Smith v. Fiber Controls Corp.*, 300 N.C. 669, 678, 268 S.E.2d 504, 509–10 (1980) ("given the recent legislative activity in this area we are not presently inclined to consider adoption of the rule of strict liability in products liability cases"). Therefore, the Court will grant defendants' motion for summary judgment with respect to counts eight and nine.

Of course the Court was constrained to decide the instant case on the record before it. However, the Court would note that *if* plaintiffs had available the materials from experts as represented, they should have submitted them. On the other hand, if plaintiffs' representations or forecast of what the experts' testimony would be never came to fruition, they should have so advised the Court.

IT IS, THEREFORE, ORDERED that defendants' motion for summary judgment be, and the same hereby is, GRANTED AS TO ALL CLAIMS.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment be, and the same hereby is, DENIED.

---

**12.** The Court notes that the informed consent form stated that compensation was not provided for non-negligent injury.