Jay Gilmer ATKINS, Plaintiff,

v.

USF DUGAN, INC., Defendant.

No. 1:98CV00627.

United States District Court,
M.D. North Carolina.

Aug. 11, 1999.

David Coventry Smith, Kilpatrick Stockton, L.L.P., Winston–Salem, NC, for Jay Gilmer Atkins, plaintiff.

John N. Taylor, Jr., Robinson & Lawing, Winston–Salem, NC, C. Ray Grantham, Jr., Robinson & Lawing, Winston–Salem, NC, M. Kathryn Webb, McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, KA, Scott Sanders, McDonald Tinker Skaer Quinn & Herrington, Wichita, KA, for USF Dugan Inc., defendant.

### *MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant USF Dugan, Inc.'s ("Dugan" or "the Company"), Motion to Dismiss [Document # 13]. Plaintiff Jay Gilmer Atkins ("Atkins") has filed a Memorandum in Opposition to Defendant's Motion to Dismiss [Document # 12]. For the reasons stated herein, Dugan's Motion to Dismiss is granted in part and denied in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND [1]

Dugan is a common carrier and maintains a facility in Greensboro, North Car-

---

1. The Court sets forth the facts viewed in the light most favorable to the plaintiff, accepting

olina. (Am.Compl. ¶ 6; Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 1.) Prior to his discharge, Atkins served as terminal manager of Dugan's Greensboro location. (Am.Compl.¶ 6.) By December 1996, he was diagnosed as having coronary heart disease, diabetes, and hypertension. (*Id.* at ¶ 7.)

Sometime just prior to December 17, 1996, Atkins suffered a heart attack which at least temporarily prevented him from continuing his employment with Dugan. (*Id.* at ¶¶ 7–8.) As a result, on December 17, 1996, he requested a medical leave of absence from the Company pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (*Id.* at ¶ 8.) On December 24, 1996, Atkins underwent quadruple bypass surgery and was instructed by his physician to postpone returning to work until March 3, 1997. (*Id.* at ¶ 7.)

On January 15, 1997, Dugan wrote to Atkins, granting him his request for a medical leave of absence. (*Id.* at ¶ 9.) He was also instructed to provide Dugan with "medical certification of [his] serious condition" by the end of January 1997. (*Id.*) On January 22, 1997, Atkins forwarded to Dugan said written certification. (*Id.* at ¶ 10.)

On January 23, 1997, Dave Brodie ("Brodie"), Atkins's regional manager at Dugan, and Lisa McDonald ("McDonald"), a human resources employee with the Company, verbally notified Atkins that his employment would be terminated if he did not return to work by January 31, 1997.

(*Id.* at ¶ 11.) Brodie also told Atkins that he was "too old and sick, that [Dugan] did not think he could handle the stress of the [terminal manager] job, and that he needed to retire." (*Id.*)

On January 24, 1997, Atkins wrote McDonald to inform her that he would not be able to return to the Company until March 3, 1997. (*Id.* at ¶ 12.) Atkins included in that correspondence a request that he be able to resume his duties with Dugan at that time. (*Id.*) However, the Company subsequently denied his request. (*Id.*) At some point after December 17, 1996, Dugan hired or promoted another individual to assume Atkins's job responsibilities. (*Id.*) That individual was "substantially younger" than Atkins. (*Id.*)

On May 15, 1997, Atkins filed a formal charge of age and disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶ 14.) On April 30, 1998, the EEOC issued to Atkins a "right to sue" letter. (*Id.*) On July 21, 1998, Atkins initiated the present action by filing his Complaint [Document # 1]. Among other things, he alleged violations of the FMLA, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and asserted state causes of action for "discharge in violation of public policy" and intentional and negligent infliction of emotional distress. After Atkins filed an Amended Complaint [Document # 11], Dugan filed the motion now before this Court.[2] For the reasons stated herein, the

as true all well-pleaded factual allegations. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995).

2. Dugan initially filed a Motion to Dismiss [Document # 8] and its corresponding Memorandum in Support of its Motion to Dismiss [Document # 9] on September 11, 1998. On September 30, 1998—subsequent to Dugan's motion but prior to Dugan's responsive pleading—Atkins filed an Amended Complaint [Document # 11]. The next day, on October 1, 1998, Atkins filed a Memorandum

in Opposition to Defendant's Motion to Dismiss [Document # 12]. Since the pleading at which Dugan's Motion to Dismiss was directed was amended, Dugan filed a new Motion to Dismiss [Document # 13] and a supporting Memorandum in Support of Motion to Dismiss Plaintiff's Amended Complaint [Document # 14] which it also described as its "Reply Memorandum in Support of [D]efendant's Motion to Dismiss the [O]riginal Complaint." (Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at n. 1.) Dugan eventually filed a separate reply memoran-

Court will grant in part and deny in part the Company's Motion to Dismiss.

## III. STANDARD OF REVIEW

With respect to a motion to dismiss for failure to state a claim upon which relief can be granted, dismissals are allowed only in very limited circumstances. *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989). Generally, a court should not dismiss a complaint for failure to state a claim "unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995).

## IV. DISCUSSION

Dugan's Motion to Dismiss is directed only at Atkins's ADA, discharge in violation of public policy, and intentional and negligent infliction of emotional distress claims. This Court will address each of these causes of action separately.

### A. *Violation of the ADA*

As noted previously, Atkins has alleged, among other things, a violation of the ADA. (Am.Compl.¶¶ 35–44.) Specifically, Atkins asserts that

> [b]ecause [he] suffered from a disability or was perceived by [Dugan] as suffering from a disability, [Dugan] willfully and intentionally discriminated against him with respect to the terms, conditions and privileges of his employment,

including by failing to hold his position open for him and discharging him. Additionally, [Dugan] failed to reasonably accommodate that disability, despite [his] request, by refusing to hold his position open for a short duration.

(*Id.* at ¶ 41.) However, Dugan contends that Atkins has failed to properly allege that he is entitled to protection under the ADA. (Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at 2–11.)

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[3] "The term 'disability' means ... (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; *or* (C) being regarded as having such an impairment." *Id.* § 12102(2) (emphasis added).

In asserting his claim against Dugan under the ADA, Atkins first alleges that he actually "suffered from a 'disability' within the meaning of 42 U.S.C. § 12102(2)(A)." (Am.Compl.¶ 38.) He further alleges that Dugan "perceived" him as having a disability, within the meaning of 42 U.S.C. § 12102(2)(C). (*Id.* at ¶ 39.) Since Dugan challenges each of these two distinct allegations, the Court will discuss them separately.

#### 1. Disability as Defined by 42 U.S.C. § 12102(2)(A)

As noted above, Atkins first contends that he actually suffered from a disability. (*Id.* at ¶ 38.) Specifically, the following

---

dum on November 20, 1998 [Document # 17].

**3.** "The term 'qualified individual with a disability' means an individual with a disability

who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

allegation is set forth in his Amended Complaint:

> Atkins, beginning in December ... 1996, was diagnosed as suffering from coronary artery disease, in addition to diabetes and hypertension. The disease affected one or more of his major life activities. For example, ... Atkins experienced extreme shortness of breath after any exertion or effort, such as simply walking from the parking lot to a building or walking to his mailbox. He would also experience a burning sensation and pain in his legs after walking relatively short distances. In addition, following his surgery in December ... 1996, ... Atkins was very tired and had difficulty eating, sleeping, and concentrating. He would at times become light headed and dizzy when standing. As a result, ... Atkins was substantially limited in his ability to breathe, walk, concentrate, work, and perform manual tasks....

(*Id.*) In support of its motion, Dugan primarily argues that the above allegation is insufficient because "the impairment alleged by [Atkins] ... was non-permanent." (Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at 3.) In addition, Dugan asserts that Atkins has failed to properly allege that his impairments substantially limit one or more of the major life activities. (*Id.* at 4–5.) As to whether Atkins has properly alleged that he is disabled as that term is defined by 42 U.S.C. § 12102(2)(A), this Court finds that there is merit to Dugan's contentions.

■ Pursuant to the ADA, a person will be considered disabled if that individual has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Thus, in order to establish the existence of a disability under this definition, a plaintiff must show that (1) the ailment cited is a "physical or mental impairment." (2) the activity limited by that impairment is a "major life activity," and (3) the impairment "substantially lim-

its" that major life activity. *See Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir.1997); *see also Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 2201, 141 L.Ed.2d 540, 553 (1998) ("[C]onsideration of subsection (A) of the definition proceeds in three steps.").

■ A review of Atkins's Amended Complaint reveals that he has adequately alleged a "physical or mental impairment" and a "major life activity," as those terms are defined by regulations promulgated in connection with the ADA. Physical or mental impairments include

> [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ... [a]ny mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). However, not all covered impairments are expressly enumerated within the regulation. Rather, it is "a representative list of disorders and conditions constituting physical impairments, including 'such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, *heart disease, diabetes,* mental retardation, emotional illness, and ... drug addiction and alcoholism.'" *Bragdon,* 524 U.S. at 630, 118 S.Ct. at 2201, 141 L.Ed.2d at 554 (citation omitted) (emphasis added). To the extent that Atkins has represented that he has suffered from "coronary artery disease, in addition to diabetes and hypertension," (Am. Compl.¶ 38), he has properly alleged an impairment covered by the ADA. With respect to the second element of the definition under 42 U.S.C. § 12102(2)(A), major life activities include "functions such as

caring for oneself, *performing manual tasks, walking,* seeing, hearing, speaking, *breathing,* learning, and *working.*" 29 C.F.R. § 1630.2(i) (emphasis added). Again, to the extent that Atkins has alleged that his impairments negatively affected major life activities, to wit, "his ability to breathe, walk, concentrate, work, and perform manual tasks," (Am. Compl.¶ 38), Atkins's assertion is sufficient to satisfy the second requirement.

■ Therefore, since Atkins has properly alleged at least one impairment and that such impairment(s) negatively affected his ability perform one or more major life activities, the primary question before the Court on this issue becomes whether the facts asserted in the Amended Complaint, even if true, properly allege that Atkins's impairments *substantially limit* one or more of these life activities.[4] Pursuant to the regulations implementing the ADA,[5] the term "substantially limits" means being either

> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).[6] The determination of whether an impairment substantially limits a major life activity requires consideration of "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). "Based on the aforementioned factors, it is evident that the term 'disability' does not include temporary medical conditions.... " *Halperin,* 128 F.3d at 199 (citations omitted). Thus, "a disabling, but transitory, physical or mental condition" will not trigger the protections of the ADA. *See McDonald v. Pennsylvania,* 62 F.3d 92, 95–96 (3d Cir. 1995).

■ Atkins alleges that multiple impairments (coronary heart disease, diabetes, and hypertension) substantially limited his ability to perform several major life activities (breathing, walking, working, and performing manual tasks). (Am.Compl.¶ 38.) Significantly, however, Atkins simultaneously alleges in his Amended Complaint that he would have been able to return to Dugan less than three months after his departure from the Company in mid-December 1996. (*Id.* at ¶¶ 7, 12, 30.) Specifically, he alleged that (1) in December 1996 his doctor instructed him to remain out of work only until March 3, 1997, (*id.* at ¶ 7), (2) on or about January 23, 1997, he sought

---

4. "The ADA contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of an individual." *Halperin,* 128 F.3d at 198 n. 10 (citing *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 59 (4th Cir.1995)).

5. The ADA regulations issued by the EEOC are not controlling by virtue of their authority. *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 n. 2 (4th Cir.1996) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49, 58 (1986)), *cert. denied sub nom. Williams v. Avnet, Inc.,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997). However, as with all EEOC guidelines, they " 'do constitute a body

of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Meritor Sav. Bank,* 477 U.S. at 65, 106 S.Ct. at 2404, 91 L.Ed.2d at 58 (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 358 (1976)). Moreover, the Fourth Circuit has on at least one occasion relied upon the EEOC guidelines to determine whether an individual was disabled within the meaning of the ADA. *See, e.g., Williams,* 101 F.3d at 349 (citing various provisions of the ADA regulations).

6. The Court notes that when the major life activity at issue is working, additional guidance is provided by the implementing regulations. *See* 29 C.F.R. § 1630.2(j)(3).

permission to return to work by March 3, 1997, (*id.* at ¶ 30), and (3) on or about January 24, 1997, he wrote to McDonald at Dugan and requested that his position with the Company "be available to him" as of March 3, 1997, (*id.* at ¶ 12). The Court finds that such allegations amount to an assertion of a "temporary" or "transitory" condition and would therefore not implicate the protections set forth by the ADA.

Similar results have been reported in this and other circuits. First, in *Halperin,* 128 F.3d 191 (4th Cir.1997), the Fourth Circuit considered whether an employee's back injury substantially limited his ability to work. The employee, Halperin, had injured his lower back while lifting equipment. His doctor had diagnosed his condition as a lumbar strain. Although Halperin missed only six days of work, he found it difficult to walk, sit, stand, and lift. As a result he requested and was granted extended leave to rest. About two months later, after obtaining permission from his doctor, Halperin returned to work with the restriction that he not lift heavy items. Shortly thereafter, he was terminated. In affirming the district court's decision to grant summary judgment against Halperin as to his ADA claim, the Fourth Circuit held that he could not establish a central element of his *prima facie* case, to wit, the existence of a disability. *Id.* at 198–201. Notably, the court placed great weight on the fact that Halperin had asserted in a sworn affidavit that he would have been able to return to work two months from the date he took his leave, finding that "[t]he evidence . . . regarding the expected duration of his impairment strongly suggests that it was only transitory." *Id.* at 200. In finding that Halperin was not disabled as that term is defined by 42 U.S.C. § 12102(2)(A), the court reasoned as follows:

Applying the protections of the ADA to temporary impairments . . . would work a significant expansion of the Act. The ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune. Rather, the ADA was designed to "assure[ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or *other ailments that temporarily limit an individual's ability to work* would trivialize this lofty objective.

*Id.* (citation omitted) (alteration in original) (emphasis added).

Second, in *McDonald,* 62 F.3d 92 (3d Cir.1995), the Third Circuit addressed a similar factual scenario. The employee in *McDonald* suffered from severe abdominal pain during working hours. As a result she was admitted to a hospital and underwent surgery. Two weeks later she requested unpaid sick leave for a period of one month, at which time her doctor indicated she could return to work. Her employer denied the request because, due to her status as a probationary employee, she was not eligible for such leave. She was then terminated. In response to the employee's suit, the employer filed a motion to dismiss, contending that she had failed to state an ADA claim. The district court granted the motion, primarily reasoning that the ADA "did not apply to the transitory disability that plaintiff had suffered. . . ." *Id.* at 94. The Third Circuit affirmed:

[I]t is clear that the plaintiff in the case before us cannot qualify for relief under the [ADA]. . . . *As the complaint reveals, her inability to work cause by the surgery was of limited duration.* She entered the hospital on December 25, 1992, and would have been able to return to her duties at [her employer] on February 15, 1993, a period of less than two months. *Although she was incapacitated for these weeks, her inability to work was not permanent, nor for such*

*an extended time as to be of the type contemplated by the statutes she cites. To apply the [ADA] ... to circumstances such as those presented here would be a massive expansion of the legislation and far beyond what Congress intended. In the absence of statutory language, or even legislative history, indicating that the Act[ ][is] to cover an impairment of such limited duration, and not within the general concept of handicap, we cannot conclude that plaintiff was entitled to the benefits of the legislation.*

*Id.* at 96 (emphasis added).

Third, in *Roush v. Weastec, Inc.*, 96 F.3d 840 (6th Cir.1996), the Sixth Circuit considered whether an employee who suffered from a kidney condition and underwent surgery to correct the impairment was entitled to protection under the ADA. The employee, Roush, began a medical leave from her employment in January 1991 and underwent a pyeloplasty to remove an obstruction from her kidney. Although she subsequently returned to work, Roush continued to suffer kidney problems throughout 1991 and 1992, and underwent several procedures to correct them. In 1993 she had a second pyeloplasty but returned to work shortly thereafter. Roush's employment was eventually terminated and she subsequently brought suit alleging, among other things, a violation of the ADA. In granting the employer's motion for summary judgment as to that claim, the district court reasoned that "because plaintiff's kidney is no longer obstructed and because her bladder infections are not chronic, and instead are only intermittent and recurrent, neither condition is a dis-

ability within the meaning of the ADA." *Id.* at 842. The Sixth Circuit affirmed, concluding that Roush's kidney condition did not constitute a disability under 42 U.S.C. § 12102(2)(A):

> [T]here is no evidence that this [kidney] impairment presently substantially limits a major life activity within the meaning of the ADA. *Although plaintiff underwent a number of surgeries and medical procedures to correct her condition and her ability to work was substantially limited during that period, this does not necessarily lead to the conclusion that plaintiff presently has a disability.* Instead, it is undisputed that plaintiff's kidney is no longer obstructed and no longer affects her ability to work. *Because plaintiff's kidney condition was temporary, it is not substantially limiting and, therefore, not a disability under the ADA.* Further, the mere possibility that a kidney blockage will recur or that further surgery will be needed is not sufficient to establish that her condition is substantially limiting.

*Id.* at 844 (citation omitted) (emphasis added).

As has been illustrated by *Halperin, McDonald,* and *Roush,* Atkins cannot establish that his impairments "substantially limit" his major life activities because he has asserted a temporary condition of limited duration. As such, he has failed to properly allege that he is disabled pursuant to 42 U.S.C. § 12102(2)(A).[7]

## 2. Disability as Defined by 42 U.S.C. § 12102(2)(C)

As noted previously, Atkins also contends that Dugan regarded him as having

---

**7.** In reaching this conclusion, the Court does not intend to minimize the serious health risks associated with the impairments alleged by Atkins, to wit, coronary artery disease, diabetes, and hypertension. Nonetheless, the express terms of the ADA require something more than just a serious impairment, to wit, that such condition "substantially limit" a major life activity. As the United States Supreme Court recently noted,

> [b]ecause the phrase "substantially limits" appears in the [ADA] in the present indica-

tive verb form, we think the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability. A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting....

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999).

a disability. (*Id.* at ¶ 39.) Specifically, the following allegation is set forth in his Amended Complaint:

> [Dugan] perceived ... Atkins as suffering from such an impairment which substantially limited his ability to work.... [Dugan], no later than December 1996, had knowledge of [Atkins]'s disability. With that knowledge, on January 23, 1997, [Dugan] ... informed ... Atkins that it was the [C]ompany's position he could no longer handle the stress of the position of terminal manager, given his disability, that he was too old and sick, that he needed to retire, and that if he did not return to work in one week he would be terminated.... At that time [Dugan] was aware that ... Atkins was recuperating from heart surgery and could not return to work until March 3, 1997. Accordingly, [Dugan] perceived ... Atkins as suffering from a disability that substantially limited his ability to work and informed [Atkins] of that perception.

(*Id.*) In support of its motion and in response to the above excerpt, Dugan argues that Atkins's "remaining allegations fail to support such a statement, and, in reality, [Atkins] fails to allege that [Dugan] did anything more than perceive [Atkins]'s condition." (Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at 8.) This Court disagrees.

As noted, pursuant to the ADA, a person has a disability if that person has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). But a person will be considered disabled under the ADA if that individual is "regarded as having such an impairment." *Id.* § 12102(2)(C). In other words, a person will be considered disabled if that person is "regarded as having ... an impairment [that substantially limits one or more of the major life activities of

such individual]." *Id.; see also Runnebaum v. NationsBank of Md., N.A.,* 123 F.3d 156, 172 (4th Cir.1997). Pursuant to the regulations implementing the ADA, the phrase "regarded as having such an impairment" means, in pertinent part, that the individual "[h]as a physical or mental impairment that does not substantially limit major life activities but is *treated* by a covered entity as constituting such limitation." 29 C.F.R. § 1630.2(*l*)(1) (emphasis added). Through this definition,

> the ADA protects from employment discrimination individuals who are regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of the major life activities, just as it protects persons who actually have an impairment that substantially limits one or more of the major life activities.

*Runnebaum,* 123 F.3d at 172. Since this Court has previously concluded that Atkins has not properly alleged that he actually has a disability, as that term is defined by 42 U.S.C. § 12102(2)(A), the remaining question before the Court is whether the facts asserted in the Amended Complaint, taken as being true, properly allege that Dugan "regarded" or "treated" Atkins as having such an impairment pursuant to 42 U.S.C. § 12102(2)(C).[8] The analysis "focuses on the reactions and perceptions of the relevant decisionmakers working with [Atkins]." *Id.* In performing this analysis, the Fourth Circuit has noted that

> an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job. The statutory reference to a substantial limitation indicates instead that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to *foreclose generally* the type of employment involved.

---

**8.** The Court again notes that Atkins has adequately alleged a "physical or mental impairment" and a "major life activity," as those terms are defined by regulations promulgated in connection with the ADA.

*Forrisi v. Bowen,* 794 F.2d 931, 934–35 (4th Cir.1986) (citations omitted) (emphasis added) (analyzing a claim under the Rehabilitation Act);[9] *see also* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").

■ In support of his claim, Atkins alleges, among other things, that (1) prior to his discharge Dugan knew of his illness and condition, (Am.Compl.¶¶ 8, 10, 39), and (2) after being informed of his impairment, Atkins's regional manager, Brodie, told Atkins "that he was old and sick, that the [C]ompany did not think he could handle the stress of the [terminal manager] job, and that he needed to retire," (*id.* at ¶ 11). This Court finds these allegations sufficient for the purposes of asserting that Dugan regarded Atkins as disabled because they contain an allegation that Dugan, through its representatives, made at least one comment—the suggestion regarding retirement—which would tend to indicate that the Company considered Atkins's impairment(s) as one which substantially limited at least one of the major life activities, to wit, the major life activity of working.

With respect to the major life activity of working, this is not a case, contrary to Dugan's argument, where the employer regarded the employee as incapable of performing a particular job or even a class of jobs. *See, e.g., Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867 (2d Cir.1998) (holding that employer did not perceive employee as being incapable of working in a broad range of jobs and, thus, did not perceive her as disabled); *Smith v. City of Des Moines,* 99 F.3d 1466 (8th Cir.1996) (holding that fire captain was not regarded by employer as having a disability merely because employer regarded him as unable to perform duties of a firefighter). Rather, by alleging that Dugan's representatives made at least one statement indicating that he should "retire," Atkins's Amended Complaint alleges a perception on the part of Dugan that he was completely incapable of holding *any* job. Therefore, Atkins has sufficiently alleged that Dugan regarded him as being disabled as that term is defined by 42 U.S.C. § 12102(2)(C). Accordingly, this Court concludes that Dugan's Motion to Dismiss Atkins's ADA claim is hereby denied.

**B.  *Discharge in Violation of Public Policy***

Atkins also alleges a claim of "discharge in violation of public policy." (Am. Compl.¶¶ 45–47.) Specifically, he contends that "[t]he conduct of [Dugan], in terminating [his] employment by reason of his age and disability, violated the public policy of the State of North Carolina." (*Id.* at ¶ 46.)

■ The Supreme Court of North Carolina first pronounced the public policy exception to the employment-at-will doctrine in *Coman v. Thomas Manufacturing Co.,* 325 N.C. 172, 381 S.E.2d 445 (1989):

"[W]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent."

*Id.* at 175, 381 S.E.2d at 447 (quoting *Sides v. Duke Univ.,* 74 N.C.App. 331, 342, 328 S.E.2d 818, 826 (1985)) (alteration in origi-

9. Because the definition of "disability" under the ADA is virtually identical to the definition of disability under the Rehabilitation Act, *see* 29 U.S.C. § 706(8)(B), the Fourth Circuit has applied the same analysis to claims under both statutes. *See Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 n. 9 (4th Cir.1995). The Fourth Circuit has also cited Rehabilitation Act cases as persuasive authority in interpreting and applying the ADA. *See, e.g., Halperin,* 128 F.3d 191, 198 (4th Cir. 1997) (citing *Gupton v. Virginia,* 14 F.3d 203 (4th Cir.), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994)).

nal). The *Coman* court stated that "[p]ublic policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Id.* at 175 n. 2, 381 S.E.2d at 447 n. 2. The Supreme Court of North Carolina more recently noted that "[a]lthough th[is] definition of 'public policy' ... does not include a laundry list of what is or is not 'injurious to the public or against the public good,' at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992).

■ Atkins contends that Dugan, by allegedly terminating his employment because of his age and/or disability, violated the public policy of North Carolina, specifically its Equal Employment Practices Act ("EEPA"), N.C.Gen.Stat. § 143–422.1 *et seq.* (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 11.)[10] The EEPA, in pertinent part, provides as follows:

> *It is the public policy of this State* to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment *without discrimination or abridgement on account of* race, religion, color, national origin, *age,* sex or *handicap* by employers which regularly employ 15 or more employees.

*Id.* § 143–422.2 (emphasis added). Thus, this Court finds that he has sufficiently alleged a cause of action for discharge in violation of public policy. *See, e.g., Hughes*

*v. Bedsole*, 48 F.3d 1376, 1383 n. 6 (4th Cir.), *cert. denied*, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995) (acknowledging that plaintiff "has an adequate state remedy in her action for wrongful discharge in violation of the public policy in N.C.Gen.Stat. § 143–422.2"); *Phillips v. J.P. Stevens & Co.*, 827 F.Supp. 349, 352–53 (M.D.N.C.1993) (holding that plaintiff adequately alleged discharge in violation of public policy where plaintiff asserted violation of the EEPA).[11]

■ However, Dugan asserts that "to the extent any remedy might be available under the common law doctrine of wrongful discharge, such remedy is merely redundant of remedies available under the federal statutes cited in [Atkins]'s complaint." (Def. USF Dugan, Inc.'s Mem. in Supp. of its Mot. to Dismiss at 9.) To the extent that Dugan argues that Atkins is precluded from bringing his discharge in violation of public policy claim because he also asserts a Title VII cause of action, this Court notes that such a position was considered—and rejected—by the Supreme Court of North Carolina in *Amos*:

> *Coman* ... was not predicated on the "no alternative remedy" theory. Indeed, we noted in *Coman* that the fired employee arguably had an "additional remedy in the federal courts." Whether the plaintiff in *Coman* was without an additional state remedy was not the key factor behind this Court's adoption of the public policy exception. The underlying rationale was the recognition that the judicially created employment-at-will doctrine had its limits and it was the

10. The Court notes that Atkins does not specifically cite the EEPA in his Amended Complaint. However, he does expressly contend that "[Dugan], in terminating [his] employment by reason of his age and disability, violated the public policy of ... North Carolina." (Am.Compl.¶ 46.)

11. The Court notes that with respect to Atkins's claim for discharge in violation of public policy Dugan contends that the EEPA does not authorize a private right of action. (Def. USF Dugan, Inc.'s Mem. in Supp. of its Mot.

to Dismiss at 10.) At least one court has noted that the EEPA "does not create a private cause of action...." *Bannerman v. Burlington Inds., Inc.*, 7 F.Supp.2d 645, 649 (E.D.N.C.1997). However, this Court need not determine whether such an independent right of action exists because, as explained above, Atkins has asserted his claim as an exception to the employment-at-will doctrine. The EEPA is invoked merely for the purposes of identifying the expressed public policy of North Carolina.

role of this Court to define those limits.... The public policy exception adopted by this Court in *Coman* is not just a remedial gap-filler. It is a judicially recognized outer limit to a judicially created doctrine, designed to vindicate the rights of employees fired for reasons offensive to the public policy of this State. *The existence of other remedies, therefore, does not render the public policy exception moot.*

*Amos*, 331 N.C. 348, 355–56, 416 S.E.2d 166, 171 (citations omitted) (emphasis added); *see also Phillips*, 827 F.Supp. at 352 ("*Amos* makes clear that the availability of an alternative remedy does not prevent a plaintiff from seeking tort remedies from wrongful discharge in violation of public policy."). Consistent with *Amos*, this Court finds that Atkins's assertion of a Title VII claim does not preclude his discharge in violation of public policy cause of action and, therefore, Dugan's motion with respect to this claim is denied.

### C. *Intentional Infliction of Emotional Distress*

Atkins further alleges that Dugan's actions "constitute[d] extreme and outrageous conduct" and that they were undertaken "with the full knowledge and intention that it would cause ... Atkins severe emotional distress." (Am. Compl.¶¶ 53–54.) In connection with his intentional infliction of emotional distress claim, Atkins asserts that Dugan knew as early as December 1996 that Atkins suffered from coronary artery disease and that by January 23, 1997, Dugan knew that Atkins "had undergone quadruple bypass surgery, was in great pain, was tired and was experiencing difficulty eating, sleeping and concentrating, and was physically and mentally fragile." (*Id.* at ¶ 49, 416 S.E.2d 166.) Dugan contends that, even if this information was known prior to the discharge, its actions do not rise to the level of conduct required to satisfy the elements of the tort. (Def. USF Dugan, Inc.'s Mem. in Supp. of its Mot. to Dismiss at 12–15;

Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at 14–18.) This Court agrees.

Under North Carolina law, in order to properly state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant engaged in extreme and outrageous conduct and (2) such conduct was intended to cause, and in fact does cause, severe emotional distress. *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (citing *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981)). Whether conduct alleged is sufficiently "extreme and outrageous" to support such an action is a question of law. *Lenins v. K-Mart Corp.*, 98 N.C.App. 590, 599, 391 S.E.2d 843, 848 (1990). Conduct is extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Briggs v. Rosenthal*, 73 N.C.App. 672, 677, 327 S.E.2d 308, 311 (1985).

In this instance, Atkins alleges conduct that is not, as a matter of law, sufficient to state a cause of action for intentional infliction of emotional distress. Essentially, Atkins alleges that, during a time when he was in poor health, Dugan (1) notified him that his employment would be terminated if he did not return to work by a specific date, (Am.Compl.¶ 11), (2) told him that he was "too old and sick" to handle his job, (*id.*), (3) terminated him in violation of federal and state discrimination law, (*id.* at ¶ 51), and (4) acted with the knowledge that Atkins was ill, (*id.* at ¶ 49). While such conduct, if it occurred, might very well be objectionable, this Court finds that it does not rise to the level of "extreme and outrageous" action under North Carolina law for several reasons.

First, "[i]n employment actions, North Carolina courts have been reluctant to find intentional infliction of emotional distress

claims actionable." *Haburjak v. Prudential–Bache Sec., Inc.,* 759 F.Supp. 293, 302–03 (W.D.N.C.1991) (citing cases). As a result, even when an defendant's actions during the course of employment are considered "intemperate," such conduct will generally be insufficient to state a cause of action for intentional infliction of emotional distress. *See Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 493–94, 340 S.E.2d 116, 122–23 (1986) (conduct not "extreme and outrageous" when co-employee screamed and shouted at plaintiff, called her names, interfered with her supervision of waitresses under her charge and threw menus at her). Second, although allegations of discrimination may, in some circumstances, serve as the basis for an intentional infliction of emotional distress cause of action, *see, e.g., Vazquez v. Bedsole,* 888 F.Supp. 727, 733–34 (E.D.N.C. 1995), acts of discrimination do not necessarily constitute "extreme and outrageous" conduct sufficient to withstand judgment as a matter of law, *see Frazier v. First Union National Bank,* 747 F.Supp. 1540, 1554 (W.D.N.C.1990). Third, while it is true that a defendant's knowledge of a plaintiff's particular susceptibility to distress will bear upon a determination of whether conduct is "extreme and outrageous," *see* Restatement (Second) of Torts § 46 cmt. f (1965), that fact is not dispositive, *see id.*

Like other cases in which the alleged conduct fell short of establishing the tort, this Court similarly finds that Dugan's alleged actions, when taken as a whole, do not rise to the level of conduct required to establish a claim of intentional infliction of emotional distress. *See, e.g., Pardasani v. Rack Room Shoes Inc.,* 912 F.Supp. 187 (M.D.N.C.1996) (conduct not "extreme and outrageous" when plaintiff alleged that he was given poor performance evaluations, denied promotions available to others, excluded from training, and finally terminated from his employment); *Patel v. Scotland Mem'l Hosp.,* 1995–1 Trade Cas. ¶ 70,971, 1995 WL 319213 (M.D.N.C.1995) (allegations

that defendants spread falsehoods about plaintiffs professional performance, even if true, not "extreme and outrageous" conduct); *Gray v. Laws,* 915 F.Supp. 747 (E.D.N.C.1994) (defendants' alleged personal bias and failure to follow proper state dismissal procedures not "extreme and outrageous" conduct); *Lorbacher v. Housing Auth. of Raleigh,* 127 N.C.App. 663, 493 S.E.2d 74 (1997) (alleged discharge for the purposes of deflecting responsibility for certain deaths and for retaliation of First Amendment rights not "extreme and outrageous" conduct). Accordingly, to the extent that Atkins's Amended Complaint does not identify conduct which can be considered extreme and outrageous, Atkins has failed to state a claim for intentional infliction of emotional distress and, therefore, this cause of action is hereby dismissed.

### D. *Negligent Infliction of Emotional Distress*

Atkins also alleges negligent infliction of emotional distress. (Am.Compl.¶¶ 58–62.) In response, Dugan asserts that Atkins is barred from bringing such a claim since "the North Carolina Workers' Compensation Act provides an employee's exclusive means of recovery for personal injuries resulting from the negligence of an employer." (Mem. in Supp. of its Mot. to Dismiss Pl.'s Am.Compl. at 18–19.) This Court disagrees.

Pursuant to the North Carolina Workers' Compensation Act ("WCA" or "the Act"), N.C.Gen.Stat. § 97–1 *et seq.,*

> every employer and employee … shall be presumed to have accepted the provisions of this Article [the WCA] respectively to pay and accept compensation for personal injury or death by accident arising out of and in the course of his employment and shall be bound thereby.

*Id.* § 97–3. In exchange for such compensation, employees relinquish certain rights and remedies:

If the employee and the employer are subject to and have complied with the provisions of this Article, then the rights and remedies herein granted to the employee ... shall exclude all other rights and remedies of the employee ... as against the employer at common law or otherwise on account of such injury or death.

*Id.* § 97–10.1; *see also Pleasant v. Johnson*, 312 N.C. 710, 712, 325 S.E.2d 244, 246–47 (1985) (noting that in "the typical workers' compensation scheme ... the employee and his dependents give up their common law right to sue the employer for negligence in exchange for limited but assured benefits").

At least one court has directly addressed the issue of whether a negligent infliction of emotional distress claim is barred by the exclusivity provisions of the WCA. In *Ridenhour v. Concord Screen Printers, Inc.,* 40 F.Supp.2d 744 (M.D.N.C.1999), the court considered whether a plaintiff who alleged negligent infliction of emotional distress as a result of sexual harassment by her employer could bring such a claim notwithstanding § 97–10.1. In concluding that her cause of action was not barred by the Act, the court, relying on *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 340 S.E.2d 116 (1986), reasoned that the "nature of the injury" alleged by the plaintiff was not the type of injury the WCA sought to remedy. *Ridenhour*, 40 F.Supp.2d at 746.[12] In *Hogan* the Court of Appeals of North Carolina held that a particular plaintiff's claim of negligent retention, alleging mental distress and humiliation as a proximate result thereof, was not barred by the exclusive remedies

provision of the Act. *Id.* at 124, 340 S.E.2d at 496. Consistent with the provisions of the WCA, the court in *Hogan* noted that "[a]lthough the Act eliminated negligence as a basis of recovery against an employer, the Act covers only those injuries which arise out of and [occur] in the course of employment." *Id.* The court concluded that the plaintiff's alleged injury did not fall within this parameter:

The emotional injury allegedly suffered by [the plaintiff], resulting from the [co-employee]'s sexual harassment, is not, in our view, a "natural and probable consequence or incident of the employment." Sexual harassment is not a risk to which an employee is exposed because of the nature of the employment but is a risk to which the employee could be equally exposed outside the employment. Therefore, [the plaintiff]'s claim is neither covered nor barred by the Act.

*Id.* (citation omitted). Similarly, in *Harrison v. Edison Bros. Apparel Stores, Inc.*, 724 F.Supp. 1185 (M.D.N.C.1989), *rev'd on other grounds*, 924 F.2d 530 (4th Cir.1991), the court held that the plaintiff's negligent retention claim was *not* barred by the exclusive remedies provision of the Act. The plaintiff in *Harrison* argued that the type of injuries alleged do not fall within those covered by the Act. The court agreed: "[The defendant] would have this court hold that the type of injuries alleged by the plaintiff, 'severe mental and emotional distress' resulting from sexual harassment, are a natural risk of employment. This position was rejected by the North Carolina Court of Appeals in *Ho-*

---

12. As alluded to in § 97–3 above, the Act defines "injury" to include "only injury by accident arising out of and in the course of the employment...." N.C.Gen.Stat. § 97–2(6). (The definition also specifically addresses "diseases," "back injuries," "disabling physical injuries," "breakage or damage to eyeglasses, hearing aids, dentures, or other prosthetic devices which function as part of the body...." N.C.Gen.Stat. § 97–3(6). It does not address non-physical effects.) An

injury arises out of the course of employment " 'when it is a natural and probable consequence or incident of the employment and a natural result of one of its risks, so that there is some causal relation between the injury and the performance of some service of the employment.' " *Robbins v. Nicholson*, 281 N.C. 234, 239, 188 S.E.2d 350, 354 (1972) (quoting *Perry v. American Bakeries Co.*, 262 N.C. 272, 274, 136 S.E.2d 643, 645 (1964)).

*gan." Id.* at 1191.[13]

■ Even if Atkins had alleged that he sustained physical injuries as a result of Dugan's alleged negligent infliction of emotional distress, his claim would not be barred by the WCA because Dugan's conduct did not occur "in the course of" his employment. When determining whether an injury occurs in the course of employment, courts should consider "the time, place and circumstances under which an accident occurs." *Bare v. Wayne Poultry Co.*, 70 N.C.App. 88, 91, 318 S.E.2d 534, 537 (1984), *rev. denied by* 312 N.C. 796, 325 S.E.2d 484 (1985). Here, Atkins alleges that Dugan, through Brodie and Mc-

Donald, inflicted emotional injury by (1) notifying him that his employment would be terminated if he did not return to work by a specific date, (Am.Compl.¶ 11), (2) telling him that he was "too old and sick" to handle his job, (*id.*), and (3) terminating him in violation of federal and state discrimination law, (*id.* at ¶ 51). Atkins alleges that negligence on the part of Dugan "caused him severe emotional distress." (*Id.* at ¶ 61). Notably, Atkins's alleged injury was not inflicted while he was at his place of employment, nor was it inflicted while he was engaging in the performance of his duties. *See Bare,* 70 N.C.App. at 91, 318 S.E.2d at 537.[14]

13. The *Hogan* court also held that the plaintiffs' claims for intentional infliction of emotional distress were not barred by the WCA. Although this Court recognizes that Atkins's claim is for *negligent* infliction of emotional distress, the *Hogan* court's discussion of the intentional infliction of emotional distress claim is instructive. The court in *Hogan* first noted that the Act was designed "to furnish compensation for loss of earning capacity," *id.* at 489, 340 S.E.2d at 120, and that the "plaintiffs apparently have suffered damages which would be recoverable in a civil action but which are not compensable under the Act," *id.* The court then focused on the nature of the injuries normally associated with such claims and ruled as follows: "The essence of the tort of intentional infliction of emotional distress is *non-physical;* the injuries alleged by [the] plaintiffs do not involve physical injuries resulting in disability. Therefore, we conclude that [the] plaintiffs' actions for intentional infliction of emotional distress are *not barred* by G.S. 97–10.1." *Id.* at 490, 340 S.E.2d at 121 (emphasis added).

Although not cited by either party, this Court notes that in a recent case, *Johnson v. First Union Corp.,* 131 N.C.App. 142, 504 S.E.2d 808 (1998), the Court of Appeals of North Carolina agreed with the defendants' contention that the WCA "gives the North Carolina Industrial Commission exclusive jurisdiction over workers' compensation claims and all related matters, *including issues such as those raised in the case at bar." Id.* at 143–44, 504 S.E.2d at 809 (emphasis added). The plaintiff in *Johnson* had alleged fraud, bad faith refusal to pay or settle a valid claim, unfair and deceptive trade practices, civil conspiracy, and intentional infliction of emotional distress claims. *Id.* at 143, 504 S.E.2d 808,. Therefore, *Johnson* might be interpreted as holding that intentional infliction of

emotional distress is barred by the Act, and is therefore in conflict with *Hogan.* Even if such a reading were possible, this Court finds *Johnson* distinguishable from the instant action. First, the Court notes that the conduct in *Johnson* giving rise to the plaintiff's intentional infliction of emotional distress claim occurred, unlike in the case before the Court, directly in connection with a WCA proceeding. Second, this Court notes that the *Johnson* court—unlike the *Hogan* panel—did not directly analyze the issue of whether the tort of intentional infliction of emotional distress is, in general, barred by the Act. It is also noteworthy that *Hogan* was not cited by *Johnson.*

14. The Court notes that *Zocco v. United States Dept. of Army,* 791 F.Supp. 595 (E.D.N.C. 1992), is not inconsistent with this Court's present ruling. In *Zocco,* the United States Army hired a contractor, which in turn hired a subcontractor, to supply and operate one of several rides during an Army fair. *Id.* at 596. The plaintiff was an employee of the subcontractor who, while performing his duties, was struck by a ride car and fell several feet, sustaining serious physical injuries. *Id.* at 597. The plaintiff subsequently sued the Army, the contractor, and the subcontractor for "negligence." *Id.* Prior to addressing the parties' procedural and substantive motions, the court, in an exercise it described as "worthwhile," summarized the WCA and its exclusivity provisions. *Id.* at 597–98. In doing so, the court stated that "these 'exclusivity provisions' prevent an employee from suing an employer for injuries attributable to the employer's negligence." *Id.* at 598 (citing *Horney v. Meredith Swimming Pool Co.,* 267 N.C. 521, 148 S.E.2d 554 (1996)). However, since the facts in *Zocco* involved an employee

Thus, to the extent that Atkins's alleged injuries are the same as those alleged in *Hogan* and *Harrison*, and since such injuries were not inflicted in the course of his employment, this Court declines to dismiss Atkins's claim of negligent infliction of emotional distress on the ground that it is barred by the WCA.

## V. CONCLUSION

For the foregoing reasons, this Court concludes that Dugan's Motion to Dismiss is granted in part to the extent that Atkins's claim for intentional infliction of emotional distress is hereby dismissed with prejudice.

This Court further concludes that Dugan's Motion to Dismiss is denied in part to the extent that Atkins has properly stated claims for violation of the ADA, discharge in violation of public policy, and negligent infliction of emotional distress.

An Order and Judgment in accordance with this Memorandum Opinion shall be filed contemporaneously herewith.

sustaining physical injuries while performing his duties, it is unclear whether the court—in making the above-quoted statement—was referring to *all* types of negligence and *all* types of injuries. Notably, even though both the *Hogan* and *Harrison* courts found that claims involving negligence (negligent retention) were not barred by the WCA, neither case was cited in *Zocco*. Thus, it is likely that the court in *Zocco* was speaking of "negligence" in terms of errant conduct on the part of an employer which results in physical injuries sustained by an employee while performing his duties. The same type of factual scenario was present in *Horney*, which *was* cited by the court in *Zocco*. *Horney* involved an employee who was electrocuted while installing a swimming pool light. It is clear that this was a physical injury that was sustained while the employee was acting within the scope of his employment and, therefore, was covered by the WCA.